E-FILED
Monday, 25 September, 2017 02:46:24 PM
Clerk, U.S. District Court, ILCD

FILED
SEP 2 2 2017
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Kevin P. Mallette, | } | |
| Plaintiff | } | Case No. 17-3127 |
| Vs. | } | |
| Governor Bruce Rauner | } | |
| Illinois State Lottery | } | |
| Northstar Lottery Group | } | |
| Respondents | } | |

### Plaintiff's First Amended Complaint

Now comes the Plaintiff (pro se) in the above captioned cause and asserts to The Court the following information:

1. The Plaintiff purchased a $5,000 A Week For Life Lottery Scratch Off Ticket on September 9, 2016 in Chicago, Illinois.

2. The ticket revealed that the Plaintiff had the necessary Symbol to win the 15 Prizes as stated on the ticket. (See Exhibit 1), and the Grand Prize.

3. The ticket had the correct winning symbols but failed to list The correct language on the $5,000 for Life ticket on its face

4. When the Plaintiff attempted to cash in the ticket, he was

Informed that the ticket value was $100.00.

5. Attempts to settle this amount to bring the Grand Prize to The Plaintiff which would total a lifetime award of $3,914,000 On a Cash Option Payment with the Illinois State Lottery have Not been successful.

Plaintiff believes that his standing comes within the United Commercial Code, Section 1-206 under the Statute of Frauds regarding negotiable documents, and That he has met the burden of criteria also under the Uniform Sales Act by his Legitimate purchase of this lottery ticket and should be compensated as such.

Plaintiff believes that the Illinois State Lottery and Northstar knew or should have known the value of these Tickets, and then participated in fraud and willful deception to the unsuspecting Public by not enforcing actual wins.

Plaintiff prays that the Court will enforce this actual win and any other remedies As the Court directs.

*Kevin P. Mallette*

Kevin P. Mallette, Plaintiff

Attorneys of Record:

Plaintiff-Pro se

Respondents-Unknown

## CERTIFICATE OF SERVICE

I, Kevin P. Mallette to certify that I have served on the all Parties on Court Case No. 17-3127, U.S. District Court, Central District a copy of Plaintiff's First Amended Copy of the Complaint by _Hand Delivery_ on _September 22, 2017_.

*Kevin P. Mallette*

Kevin P. Mallette

Not a Legal Professional? Visit our consumer site
Register | Login

CASES & CODES   PRACTICE MANAGEMENT   JOBS & CAREERS   NEWSLETTERS   BLOGS   LAW TECHNOLOGY   Search FindLaw
Forms   Lawyer Marketing   Corporate Counsel   Law Students   JusticeMail   Reference


Every 8 minutes, we respond to a disaster.
American Red Cross   HELP NOW

FindLaw  Caselaw  United States  US 7th Cir.  BURRUS v. STATE LOTTERY COMMISSION OF INDIANA

# BURRUS v. STATE LOTTERY COMMISSION OF INDIANA

Print    6    Font size:  A  A  Reset

### United States Court of Appeals, Seventh Circuit.

**Freddie BURRUS, et al., Plaintiffs-Appellees, v. STATE LOTTERY COMMISSION OF INDIANA, d/b/a The Hoosier Lottery, Defendant-Appellant.**

### No. 08-1142.

### Decided: October 06, 2008

Before BAUER, RIPPLE, and MANION, Circuit Judges. Nora L. Macey (argued), Attorney, Macey Swanson & Allman, Indianapolis, IN, for Plaintiffs-Appellees. Andrew M. McNeil (argued), Attorney, Bose Mckinney & Evans, LLP, Indianapolis, IN, for Defendant-Appellant.

Plaintiffs, seven former employees of the State Lottery Commission of Indiana, which does business under the name Hoosier Lottery (hereinafter "Lottery"), sued their former employer under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964.  They claimed that they were fired because of their race.  The Lottery moved to dismiss the plaintiffs' § 1981 claims on the basis that it was a state agency and therefore entitled to sovereign immunity pursuant to the Eleventh Amendment.  The district court denied the Lottery's motion, and we affirm.

I.

The Indiana General Assembly created the Lottery in 1989 to operate lottery games "as a separate body politic and corporate from state government."  Ind.Code § 4-30-1-2(1).  It intended the Lottery to function "as much as possible as an entrepreneurial business enterprise," and mandated "[t]hat the lottery games be operated as a self-supporting revenue raising operation."  Id. § 4-30-1-2(1), (3).  Over the years, the Lottery has more than proved its ability to raise revenue: from its inception, the Lottery has made over $3 billion in profits, including over $210 million in fiscal year 2007 alone.  Ind. State Budget Agency, Distribution of Build Indiana Fund and Lottery and Gaming Revenues 3 (2007), http://www.in.gov/sba/files/LGS_Distribution_Report_2007.pdf (last visited Sept. 23, 2008).

To enable the Lottery to commence operations, the Indiana General Assembly authorized up to $18 million in start-up appropriations.  As it turned out, the Lottery did not need that much money to get up and running.  The Lottery's audit statement of cash flows for its first fiscal year shows that the money actually appropriated from the State during that period was just over $6 million, and that sum was promptly repaid with interest during the same fiscal year.  The parties have stipulated that the Lottery's financial reports show no other appropriations from the state other than that initial, promptly repaid sum.

The governor of Indiana appoints a five-member commission to operate the Lottery as well as a director, who is charged with "maximiz[ing] revenues in a manner consistent with the dignity of the state and the welfare of its citizens."  Ind.Code §§ 4-30-5-1, -3.  The Lottery is "a body politic and corporate separate from the state."  Id. § 4-30-3-1.  It has the authority to sue and be sued in its own name.  Id.  When the Lottery is sued, the director of the Lottery makes the final decision about whether the Lottery will agree to a settlement and how much the Lottery will pay.  When the Lottery pays a monetary settlement or any other legal obligation, the money comes from the Lottery's administrative trust fund as a general operating expense.  Should the Lottery default on any of its monetary obligations, the Indiana Attorney General's official position is that the state would not be liable.  1991 Ind. OAG No. 10.

The Lottery deposits all of its revenue, which is "continually appropriated" to the Lottery, in an administrative trust fund that is separate from the state's general fund.  See Ind.Code §§ 4-30-15-1, 4-8.1-1-3.  The money in the administrative trust fund is used to pay the prizes and the Lottery's expenses, such as the cost of supplies and any legal settlement or monetary judgment.  Id. § 4-30-16-1.  After the payment of prizes and expenses, the surplus revenue from the administrative trust fund is disbursed as follows: $7.5 million each quarter goes to the state treasurer for deposit in the Indiana state teachers' retirement fund; $7.5 million each quarter goes to the state treasurer for deposit in the pension relief fund; and any surplus remaining in the Lottery fund on the last day of January, April, July, and October after the transfers to the pension funds goes to the state treasurer for deposit in the "build Indiana fund."  Id. § 4-30-16-3.  The build Indiana fund is used for state or local capital projects, though prior to using the funds for that purpose the state treasurer is required to transfer $19,684,370 each month from the build Indiana fund to what is exhaustively titled the "state general

FindLaw Career Center
Attorney
Corporate Counsel
Academic
Judicial Clerk
Summer Associate
Intern
Law Librarian

Search Jobs  Post a Job | View More Jobs
View More


FACTORY AUTHORIZED CLEARANCE
STEP UP YOUR RIDE WITH A NEW INDY
LEARN MORE   POLARIS

**Funny Legal Updates**
Subscribe to Legal Grounds
Free FindLaw Newsletters
Newsletters.FindLaw.com

**Legal Pop Culture**
Subscribe to Fame and Folly.
Free FindLaw Newsletters
Newsletters.FindLaw.com

**Is It Legal?**
Latest criminal legal news delivered to your Inbox.
Newsletters.FindLaw.com

fund motor vehicle excise tax replacement account." Id. § 4-30-17-3.5(a). In the event that the funds in the build Indiana fund are insufficient to meet the required transfer amount, the "auditor of state" is required to make up the difference from the state general fund. Id. § 4-30-17-3.5(b).

For the most part, the Lottery operates independently from the state. It establishes its own annual budget and is not required to submit its budget to the Indiana General Assembly for approval. It determines the type of lottery games it conducts and the manner in which it conducts them. See id. § 4-30-3-7. It selects its own internal auditor. It has the power to purchase its own insurance; own, sell, and lease real and personal property; and own and enforce copyrights, trademarks, and service marks. Id. §§ 4-30-3-10 to -12. It has the power to enter into contracts for the purchase or lease of goods and services. Id. §§ 4-30-3-16 to -17. And it establishes and maintains its own personnel program for its employees.

Though the Lottery has substantial operational independence, it is still heavily regulated by the state. The Lottery is required to maintain weekly records of lottery transactions. Id. § 4-30-3-4. It is subject to an annual audit by the state board of accounts and the state budget agency. Id. §§ 4-30-19-1 to -2. It must submit revenue and expenditure reports to the state budget agency and each legislative member of the budget committee upon request. Id. § 4-30-19-4.2. It also has to submit monthly and annual reports to the governor disclosing revenue, expenses, and prize payouts. Id. § 4-30-3-3. In addition, the Lottery, like other public entities, is subject to the Indiana Open Door Law, see id. § 5-14-1.5-2(a)(3)(B), and the Indiana Public Records Act, id. § 5-14-3-2(m)(8).

This action was brought after each of the plaintiffs' employment at the Lottery was terminated between January and May 2005. All but one of the plaintiffs brought their employment discrimination claims against the Lottery solely under § 1981. The Lottery moved to dismiss the plaintiffs' § 1981 claims on the basis of sovereign immunity. The district court denied the motion, and the Lottery appeals.

II.

This appeal presents only one issue: whether the Lottery is entitled to assert state sovereign immunity under the Eleventh Amendment to defeat the plaintiffs' § 1981 claims. Our review of that issue is de novo. Wisconsin v. Ho-Chunk Nation, 512 F.3d 921, 929 (7th Cir.2008) (noting that a grant or denial of sovereign immunity is reviewed de novo).

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. "Although the Amendment speaks of suits filed by citizens of another state, the Supreme Court 'has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.'" Peirick v. IUPUI Athletics Dep't, 510 F.3d 681, 694-95 (7th Cir.2007) (quoting Edelman v. Jordan, 415 U.S. 651, 662-63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (internal citations omitted)). In addition, the Supreme Court has held that state agencies, as arms of the state, are immune from suit under the Eleventh Amendment. See Edelman, 415 U.S. at 663, 94 S.Ct. 1347; see also Joseph v. Bd. of Regents of Univ. of Wis. Sys., 432 F.3d 746, 748 (7th Cir.2005).

The Lottery claims that it is a state agency; the plaintiffs assert that it is not. To determine if a particular entity is an arm of the state, courts look primarily at two factors: (1) the extent of the entity's financial autonomy from the state; and (2) the "general legal status" of the entity. Kashani v. Purdue Univ., 813 F.2d 843, 845-47 (7th Cir.1987). Of the two, the entity's financial autonomy is the "most important factor." Peirick, 510 F.3d at 695; see also Edelman, 415 U.S. at 663, 94 S.Ct. 1347. In evaluating that factor, we consider the extent of state funding, the state's oversight and control of the entity's fiscal affairs, the entity's ability to raise funds independently, whether the state taxes the entity, and whether a judgment against the entity would result in the state increasing its appropriations to the entity. Kashani, 813 F.2d at 845; see also Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 48, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) (recognizing "the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations").

Taking into account these considerations, we find that the first factor cuts heavily against finding that the Lottery is an arm of the state of Indiana. The Lottery's complete lack of fiscal reliance upon the state is plain. The Lottery's funds are kept in an administrative trust fund separate and apart from the state's general fund. True to the state legislature's intent that the Lottery "be operated as a self-supporting revenue raising operation," Ind.Code § 4-30-1-2(3), the Lottery funds all of its own operations with the revenue generated from the games it operates. The revenue the Lottery generates from the games is enormous, totaling billions of dollars in profits alone. Given that large stream of revenue, the Lottery has no need for recourse to the state treasury. The Lottery has not received any funds from the state treasury since the $6 million given upon its inception, and that money was quickly paid back with interest.

Most importantly, the Lottery pays any legal obligation from its own administrative trust fund. The Indiana Attorney General has expressly disclaimed liability for any of the Lottery's monetary obligations. See 1991 Ind. OAG No. 10. Under that official opinion, the state treasury is not exposed should there be a monetary judgment against the Lottery in this case. Because the Lottery raises revenue on its own account, controls and funds its own operations, and does not expose state coffers when monetary judgments are rendered against it, we conclude that it is an entity financially independent from the state. Cf. Miller-Davis Co. v. Ill. State Toll Highway Auth., 567 F.2d 323, 327 (7th Cir.1977) (holding that the Eleventh Amendment did not bar suit against the Illinois State Toll Highway Authority where the highway authority raised its own revenue through bonds and tolls and the state expressly disclaimed liability for the bonds).

The Lottery's protests to the contrary are unavailing. The Lottery argues that it maintains significant financial ties to the state because its primary purpose is to raise revenue for the state. According to the Lottery, should a monetary judgment deprive it of the ability to meet its revenue goals, the state would have

less revenue, thereby impacting the state treasury. It is undisputed that a great portion of Lottery revenues- the money left over after the Lottery's operating costs are covered-is transferred to the Indiana state teachers' retirement fund, the Indiana pension relief fund, and the build Indiana fund. And it is also undisputed that, according to statute, if the build Indiana fund has insufficient funds to meet its transfer requirements to the state general fund motor vehicle excise tax replacement account, the state has to tap the general fund to make up the difference. See Ind.Code § 4-30-17-3.5(b). (Although not mentioned in the record, we will even assume that the same is true of the other two funds.)

Nevertheless, that is not the type of effect on the state fisc that our prior cases have considered the mark of a state agency. We have been concerned with the effect of monetary judgments on the state treasury only when the entity against which the judgment is rendered is dependent on state appropriations. See, e.g., Kashani, 813 F.2d at 846 ("If a judgment were awarded against Purdue, the state treasury would not write out a check to Kashani. But in view of the fact that Purdue is by design dependent on state appropriations, which are evidently carefully geared through close oversight to meet the changing financial needs of the university, it is apparent that the payment would directly affect the state treasury."). In contrast, the Lottery is not dependent on state funds for its operations. There are therefore no fungible funds from the state treasury that would have to be replaced in the event of a judgment award. The state may be deprived of some of its anticipated (and hoped-for) revenue, but "the Supreme Court has rejected the state-benefit theory of sovereign immunity." Takle v. Univ. of Wis. Hosp. & Clinics Auth., 402 F.3d 768, 770 (7th Cir.2005). According to the Supreme Court,

> The proper focus is not on the use of profits or surplus, but rather is on losses and debts. If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is "No"-both legally and practically-then the Eleventh Amendment's core concern is not implicated. It would indeed heighten a "myster[y] of legal evolution" were we to spread an Eleventh Amendment cover over an agency that consumes no state revenues but contributes to the State's wealth.

Hess, 513 U.S. at 51 and n. 21, 115 S.Ct. 394. The Lottery is a pure profit producer for the state, with no potential for the state to incur debt. The fact that a judgment against the Lottery may "affect" the state treasury in the sense that the state treasury will not be quite as flush absent the money paid the plaintiffs by the Lottery is not pertinent to the Eleventh Amendment analysis.

In arguing that it is financially dependent on the state, the Lottery also points to a statute that states that the money in the Lottery's administrative trust fund is "continually appropriated to the commission for the purposes specified in this article." Ind.Code § 4-30-15-1. The money in the Lottery's administrative trust fund is completely generated by the Lottery. The Lottery is a source for state revenue, not a siphon. The type of "appropriation" referred to in § 4-30-15-1 of the Indiana Code is therefore not an appropriation from the state treasury. Thus, it is of a different kind than the appropriations we have found to be the mark of a state agency, namely, those appropriations that come "directly from the state." Kashani, 813 F.2d at 845.

Moving on to the second factor-the general legal status of the entity-it too supports a conclusion that the Lottery is not an arm of the state. The Lottery generally controls its own operations. Like a private enterprise, the Lottery maintains control over its own operating budget and has the power to enter into contracts; own and enforce trademarks and service marks; sell, own, and lease property; and sue and be sued in its own name. Furthermore, the statute creating the Lottery states that the Lottery is "a body politic and corporate separate from the state," Ind.Code § 4-30-3-1 (emphasis added), and should "function as much as possible as an entrepreneurial business enterprise." Id. § 4-30-1-2(1). The Indiana Attorney General, interpreting that statutory language, determined that the state will not be liable for any financial obligations of the Lottery. 1991 Ind. OAG No. 10. And the Indiana Supreme Court, in applying that statutory language, has held that employees of the Lottery are not employees of the state of Indiana. Nobles v. Cartwright, 659 N.E.2d 1064, 1072 (Ind.Ct.App.1995). In short, the state acts like the Lottery is a separate entity. While the question of sovereign immunity is a matter of federal law, the state of Indiana's own view of the entity it created is significant. See Peirick, 510 F.3d at 696. And the manner in which Indiana law treats the Lottery cuts heavily against finding that the Lottery is an arm of the state.

The Lottery, unsurprisingly, takes a different view of its status vis à vis the state. The Lottery points to the fact that the governor appoints the members of the commission that operates the Lottery in an attempt to show that it is a mere appendage of the state. But "the power to appoint is not the power to control." Takle, 402 F.3d at 770; see also Auer v. Robbins, 519 U.S. 452, 456 n. 1, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (noting that although the governor appointed four of the five-member board of police commissioners, the "board [was] not subject to the State's direction or control in any other respect"). As we have explained above, despite the governor's appointment of its commissioners, the Lottery sets its own budget, controls its day-to-day operations, sues in its own name, and brings in its own revenue. Indeed, with respect to litigation, the director of the Lottery, and not a state officer like the attorney general, makes the final decision about whether the Lottery will agree to a settlement and how much the Lottery will pay.

Moreover, the governor's power to appoint the Lottery commissioners is overshadowed by the Lottery's financial independence from the state. "[W]here the evidence is that the state did not structure the entity to put the state treasury at risk of paying the judgment, then the fact that the state appoints the majority of the governing board of the agency does not itself lead to the conclusion that the entity is an arm of the state." Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp., 322 F.3d 56, 68 (1st Cir.2003). "Moreover, rendering [the control that comes through the exercise of a governor's appointment power] dispositive does not home in on the impetus for the Eleventh Amendment: the prevention of federal-court judgments that must be paid out of a State's treasury." Hess, 513 U.S. at 48, 115 S.Ct. 394.

Here, there is no question that the state of Indiana intended to protect its state purse from a judgment against the Lottery. The several provisions from the Indiana Code cited above clearly establish the Lottery as an entity separate from the state. And the official opinion of the Indiana Attorney General verifies that the Lottery is not an agency of the state. Accordingly, that the Lottery operates independently from Indiana's state treasury is the determinative factor in the Eleventh Amendment analysis. That factor greatly outweighs the fact that Indiana's governor appoints the Lottery commissioners. See id. at 47-48, 115 S.Ct. 394; Takle, 402 F.3d at 770-71.

We are similarly unpersuaded by the Lottery's reference to the state regulations to which it is subjected. The regulations demonstrate that the public takes a healthy interest in its operation, like the public does with a utility or any other quasi-public entity. Beyond that, however, the regulations for Eleventh Amendment purposes are not significant. Similar regulations did not change our conclusion in Takle that the University of Wisconsin Hospital and Clinics Authority was not an arm of the state of Wisconsin. See Takle, 402 F.3d at 771 (referring to the fact that the University of Wisconsin Hospital and Clinics Authority was subjected to Wisconsin's open-meeting laws as "minor strings"); see also Durning v. Citibank, N.A., 950 F.2d 1419, 1427 (9th Cir.1991) ("Admittedly, the Authority is more closely tied to the state than an ordinary corporation. The governor and state treasurer serve on its board, and it is subject to the state's open meetings law. Nonetheless, its separate corporate status is clearly established."). Likewise, the existence of such regulations does not alter our conclusion here. The Lottery is not entitled to invoke the Eleventh Amendment.

III.

The Lottery is not entitled to sovereign immunity because it is not an arm of the state. We therefore AFFIRM the decision of the district court denying the Lottery immunity from the plaintiffs' 42 U.S.C. § 1981 claims.

FOOTNOTES

1. We have jurisdiction over this appeal pursuant to the collateral order doctrine. Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (holding that "States and state entities that claim to be 'arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity").

MANION, Circuit Judge.

RESEARCH THE LAW    Cases & Codes / Opinion Summaries / Sample Business Contracts / Research An Attorney or Law Firm
MANAGE YOUR PRACTICE    Law Technology / Law Practice Management / Law Firm Marketing Services / Corporate Counsel Center
MANAGE YOUR CAREER    Legal Career Job Search / Online CLE / Law Student Resources
NEWS AND COMMENTARY    Law Commentary / Featured Documents / Newsletters / Blogs / RSS Feeds
GET LEGAL FORMS    Legal Forms for Your Practice
ABOUT US    Company History / Media Relations / Contact Us / Privacy / Advertising / Jobs
FIND US ON     

Copyright © 2017 FindLaw, a Thomson Reuters business. All rights reserved.